**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MIKA DUNK FRENCHSHALL, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>ULTA BEAUTY, INC.,<br><br>*Defendant*. | **CASE NO. __________**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mika Dunk Frenchshall ("Plaintiff") brings this case against Defendant Ulta Beauty, Inc. ("Defendant" or "Ulta") on behalf of herself and other customers who made in-store purchases at an Ulta located in Virginia, asserting a claim under the Virginia Personal Information Privacy Act, Va. Code § 59.1-442 et seq. ("VPIPA"). Plaintiff alleges the following upon information and belief and investigation of counsel, except for those allegations pertaining to Plaintiff, which are based on personal knowledge.

## INTRODUCTION

1. Ulta is one of the largest beauty retailers in the United States and, unbeknownst to its millions of customers, sells information related to its customers that it collects when customers make in-store purchases at Ulta locations throughout the country, including Ulta stores based in the Commonwealth of Virginia. Ulta collects basic personal identifiers, financial information, and transaction history from customers during in-store purchases. It then sells this data directly to

vendors and business partners, as admitted in its Ulta Privacy Policy ("Privacy Policy").[1] This practice violates VPIPA, and Plaintiff seeks damages, reasonable attorneys' fees, and costs, on behalf of herself and all others similarly situated, who were aggrieved by Ulta's VPIPA violations.

**PARTIES**

2. Plaintiff is a citizen and resident of Virginia. She made an in-store purchase in the amount of $33.92 at a brick-and-mortar Ulta store, located in Chesapeake, Virginia, via her CashApp card on May 22, 2025.

3. During this transaction, Plaintiff did not see any sign at the store entrance, checkout area, payment terminal, or elsewhere informing her that Ulta would sell information concerning her that was gathered in connection with her purchase. Ulta did not otherwise provide Plaintiff such notice before or at the time of the transaction.

4. Because Ulta provided no such notice, Plaintiff had no opportunity to exercise the right expressly provided by Va. Code § 59.1-442(A) to request that Ulta not sell information concerning her.

5. Defendant Ulta Beauty, Inc. is a Delaware corporation with its principal place of business in Bolingbrook, Illinois.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The proposed Class contains at least 100 members. The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Specifically, it is estimated that hundreds of thousands of Virginians shop in-person at Virginia Ulta locations each year. Given the $100 statutory damages per violation of VPIPA, the amount in controversy is at minimum in the tens of millions of dollars.

---

[1] https://www.ulta.com/company/privacy (last accessed November 12, 2026).

Additionally, the matter is a class action in which one or more members of the proposed class, including Plaintiff, are citizens of a state different from Defendant.

7. The Court has personal jurisdiction over Ulta because Ulta is headquartered in Illinois, and has substantial contacts with, and receives substantial benefits and income from, the State of Illinois.

8. Venue is proper under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Ulta, the sole Defendant, maintains its principal place of business in Bolingbrook, Illinois, within this District. Its contacts with this District would subject it to personal jurisdiction if this District were a separate State.

## FACTS

### I. First-Party Data And Information Collected From Retail Customers Is Valuable.

9. Ulta and other retailers collect data from customers during in-store purchases in part because first-party data is commercially valuable. In fact, first-party customer data has become one of the most valuable assets in the modern digital economy.[2]

10. Companies collect first-party data by tracking how customers interact directly with their own channels, including in-store retail purchases, website visits, and other direct customer interactions.[3]

11. This information is uniquely valuable because it reflects a customer's actual relationship with the company: what the customer buys, how often the customer shops, which

[2] https://www.forbes.com/councils/forbestechcouncil/2023/10/24/the-evolution-of-retail-media-networks-the-first-party-data-revolution/ (last accessed November 12, 2026).

[3] https://www.compuvate.com/first-party-data-collection-strategies-building-customer-intelligence-without-third-party-cookies/ (last accessed November 12, 2026).

products the customer considers, and how the customer moves across a retailer's physical and digital platforms.

12. As privacy restrictions and customer concerns have reduced the usefulness of third-party tracking tools, companies have placed even greater emphasis on first-party data.[4] The diminished use of third-party cookies has not reduced the value of customer data; advertisers have instead learned to lean more heavily on first-party data and develop new ways to share and use it.

13. For retailers, this shift has created a powerful new revenue opportunity. Retail media networks allow retailers to sell advertising opportunities to brands seeking to reach the retailer's own customers using data the retailer collected from those customers' purchases and shopping behavior.[5]

14. The commercial value of this data comes from precision. A retailer's first-party data can show not only who a customer is, but what that customer is likely to buy, when the customer may be ready to buy it, and what related products or services may appeal to that customer.

15. Advertisements can then be targeted to customers at the point of purchase through a retailer's app, website, or store, while the retailer uses resulting purchase patterns to further improve its customer data. The more complete the customer profile, the more useful it becomes to advertisers and the more revenue the retailer can generate from access to that audience.

---

[4] *Id.*

[5] *See*, *e.g.*, https://cdn.prod.website-files.com/68daaf51555d6adf0c767571/690b6a5a317d5d3795161974_12-ways-to-supercharge-digital-advertising-with-data-clean-rooms.pdf (last accessed November 12, 2026).

16. Companies recognize the commercial value of customer data. The FTC has described how companies can analyze consumer data to predict preferences, tailor services, and guide individualized marketing.[6]

17. Retail media networks give retailers an effective way to monetize collected first-party data and leverage direct access to customers. In that environment, customer information is not merely incidental to a retail transaction. It is a separate economic asset that can be packaged, analyzed, enhanced, and used to sell more valuable advertising opportunities.

18. Customer information gathered in connection with a retail purchase has value both to the retailer that seeks to monetize it and to the customer whose privacy and control over that information is invaded when it is sold without notice. A customer who purchases goods from a retailer subject to the VPIPA receives not merely the tangible goods purchased, but also the substantive privacy protection Virginia law affords to information concerning the customer that is gathered in connection with that transaction. When a retailer secretly monetizes that information contrary to the VPIPA, the retailer captures additional economic value from the transaction for itself, while depriving the customer of control over personal information and of the privacy protection that formed part of the legally protected transaction.

## II. Ulta Collects Customer Information Through In-Store Purchases And Uses Customer Data In Its Advertising Business.

19. Ulta collects data from its customers through a wide range of activities.

20. In its current Privacy Policy, last updated September 30, 2026, Ulta states that it collects a wide range of information from its customers:

---

[6] *See*, *e.g.*, https://www.ftc.gov/system/files/documents/reports/big-data-tool-inclusion-or-exclusion-understanding-issues/160106big-data-rpt.pdf (last accessed November 12, 2026) and https://www.forbes.com/sites/daraabasiita/2026/06/10/your-data-sets-your-price-a-federal-study-showed-exactly-how/ (last accessed November 12, 2026).

**Basic Identifying Information.** Information such as your full name, signature, postal address, e-mail address, phone number, account name, username, and other similar identifiers.

**Device Identifier and other Unique Identifiers**. Information we collect automatically when you engage with our Sites and Products, or engage in Communications with us, such as your device identifier, internet protocol (IP) address, cookies, beacons, pixel tags, mobile ad identifier, and other unique identifiers. For more information, see **Cookies and Related Tracking Technologies**.

**Health Information**. Information such as your skin condition, scalp condition, and any other health related information you may share with us in Communications with us, through the Community, through Virtual Beauty Programs, or through AI-powered shopping, recommendation, and product discovery experiences.

**Payment Information**. Information such as your payment information, credit card information, and other forms of payment to permit you to purchase our Products. We may collect this information directly from you and from our Third Party partners, any other health related information you may share with us in Communications with us or through the Community.

**Internet or Other Network Activity**. Information such as your browsing or search history, engagement with the Community, and other information regarding your interactions with our Sites, Products, emails, and advertisements. We gather this information automatically from your devices, from you directly, and from our Third Party partners.

**Geolocation Information**. Information that permits us to determine your general location, such as zip code, so that we can best determine the closest Store to your location, or where to ship our Products, or what Products to offer you. We gather this information directly from you when you engage with our Sites.

**Commercial Information**. Information such as the nature of the Products you've considered on our Sites and in our Stores, your beauty preferences, your Product interests, your shopping goals, your Product comparison activity, your interactions with recommendation tools or shopping assistants, your preferences, your purchase history, your loyalty account history, your engagement with the Community, and related information concerning your commercial activity. We obtain this information directly from you when you engage with our Stores, Sites, and Products and from our Third Party partners.

**User Content**. Information such as your Communications with us and any other content you provide, such as social media profiles, engagement with the Community, photographs, images, videos, survey responses, comments, product reviews, testimonials, and other content. This may include information, prompts, questions, and other content submitted through AI-powered shopping, recommendation, and product discovery experiences.

> **Biometric Information**. Information such as your facial geometry when you use our Virtual Beauty Try-On feature or related features through our Sites, Stores, or Products. We obtain this information directly from you and from our Third Party partners.
>
> **Audio and Visual Information**. Information such as photographs, images, videos, and recordings of your voice (such as when we record customer service calls for quality assurance). We obtain this information directly from you and from our Third Party partners.
>
> **Inferences**. Information such as inferences we may draw on the above information and your interaction with us. We obtain this information directly from you, automatically from your devices, and from our Third Party partners.[7]

21. Ulta states that it obtains commercial information through customer interactions with its stores, sites, and products: "We obtain this information directly from you when you engage with our Stores, Sites, and Products and from our Third Party partners."[8]

22. Ulta packages the vast amount of data it collects from customers through their in-store purchases. One way it does this is through the use of LiveRamp, which advertises itself as "Connect[ing] every signal, platform, and agent to power and prove intelligent marketing with the data collaboration network for the AI era."[9]

23. A published case study describing Ulta's partnership with Snap and LiveRamp states that "[i]n mid-2020, Ulta Beauty, Snap, and LiveRamp partnered to integrate ***in-store purchases made at Ulta Beauty*** within ads performance measurement on Snapchat," with "Ulta

---

[7] https://www.ulta.com/company/privacy (last accessed November 12, 2026, terms last updated on September 30, 2026).

[8] *Id.*

[9] https://liveramp.com/ (last accessed November 12, 2026).

Beauty's extensive and growing store footprint enabl[ing] this partnership to produce much more complete – and very strong – results on Snapchat."[10] (emphasis added).

24. In sum, upon information and belief, Ulta connects individual in-store purchases to particular consumers even when a customer does not otherwise identify herself, or consent to the sharing or selling of her data, at checkout.

25. Plaintiff paid for her May 2025 in-store purchase using a CashApp card. On information and belief, Ulta therefore associated Plaintiff's transaction and purchase information with an identifier capable of linking her in-store purchase to a customer or household profile in the manner described above.

## III. Ulta Sells The Data It Collects From Customers During In-Store Purchases In Violation Of VPIPA.

26. Ulta sells the data it collects from customers in a wide variety of ways.

27. In the same Privacy Policy where it admits to collecting information from customers during in-store purchases, Ulta states that it sells this information or data to third parties:

> **Notice of Sale and Sharing**
>
> We "sell" and "share" your personal information through the use of certain Third Party tools on the Sites and offline, including those relating to analytics and advertising. Specifically, we make available certain of your personal information, online identifiers and other persistent online identifiers with advertising, analytics, and marketing partners that may be considered a "sale" or "sharing" of your personal information, as defined under California law. We don't knowingly sell or share the personal information or sensitive personal information of any California resident who is 16 years or younger.[11]

28. These disclosures are not readily apparent for in-store purchasers.

---

[10] https://cdn.featuredcustomers.com/CustomerCaseStudy.document/ulta-beauty-partners-with-snapchat-liveramp-for-omnichannel-measurement-and-optimization.pdf (last accessed November 12, 2026).

[11] https://www.ulta.com/company/privacy (last accessed November 12, 2026, terms last updated on September 30, 2026).

29. Ulta is even more specific about how it sells customer data elsewhere in its business.

30. Ulta partners with Epsilon to use first-party data to build customer profiles and deliver advertising through UB Media, Ulta's retail media network. Epsilon states that its identity solution helps Ulta develop profiles of existing and potential customers from loyalty-program data and that UB Media helps brand partners create full-funnel marketing campaigns.[12]

31. And Ulta has entered what it calls a "strategic data sharing collaboration" with NielsenIQ ("NIQ"), a consumer intelligence company, under which Ulta sells its sales data with NIQ for inclusion in an NIQ product marketed to beauty brands and retailers. On information and belief, Ulta derives commercial benefit from this arrangement.[13]

32. Ulta therefore does not merely sell generalized market statistics detached from its customers. Ulta monetizes information derived from actual customers' shopping and purchase behavior by using that information to identify, create, target, and activate commercially valuable customer audiences for advertisers and suppliers.

33. Plaintiff alleges that Ulta's sale of covered purchaser information without the required notice violates the VPIPA, which provides in relevant part:

> No merchant, without giving notice to the purchaser, shall sell to any third person information that concerns the purchaser and that is gathered in connection with the sale, rental, or exchange of tangible personal property to the purchaser at the merchant's place of business.

Va. Code § 59.1-442(A).

---

[12] https://www.epsilon.com/us/client-success/case-studies/ulta-beauty (last accessed November 12, 2026).

[13] https://www.nasdaq.com/press-release/niq-and-ulta-beauty-announce-strategic-data-sharing-collaboration-2026-04-30 (last accessed November 12, 2026).

34. VPIPA prohibits a merchant, absent the required notice, from selling to a third person "information that concerns the purchaser and that is gathered in connection with" an in-store sale. Va. Code § 59.1-442(A). The statute does not limit protected information to a purchaser's name, address, or other direct personal identifier, and Plaintiff alleges that pseudonymization or other modification does not remove information from the statute's protection when the information still concerns a purchaser.

35. Ulta therefore cannot avoid VPIPA simply by changing the form of purchaser information before monetizing it. An advertising audience defined by customers' purchase histories, brand switching, shopping frequency, spending, or other transaction-derived criteria remains based upon information gathered concerning the purchasers whose behavior defines that audience.

36. Ulta's own Privacy Policy, along with the commercial relationships with data brokers, brands, and advertisers, as described above, demonstrate that Ulta is selling customer data.

37. Nor does Ulta's use of pseudonymous identifiers or data-clean-room technology necessarily sever the relationship between the commercial product and the underlying purchaser. On information and belief, Ulta can associate debit- and credit-card transactions with identifiers mapped to individual consumers, uses identity-resolution technology to connect in-store shoppers with online identities, and uses LiveRamp data-clean-room technology to connect advertising activity with actual Ulta sales.

38. Staff of the Federal Trade Commission's Office of Technology and Division of Privacy and Identity Protection have cautioned that data clean rooms can preserve many of the

same privacy risks associated with other tracking technologies, can obscure privacy harms, and can facilitate the identification and tracking of people across the web and in the real world.[14]

39. Thus, regardless of how Ulta characterizes what it sells or shares with third parties, it does not change Plaintiff's allegation that the commercially valuable information Ulta provides to third parties concerns purchasers and is derived from information Ulta gathered in connection with their in-store purchases.

## CLASS ACTION ALLEGATIONS

40. Plaintiff brings the asserted claim on behalf of the proposed class ("Class") defined as follows:

> **All persons who made an in-store purchase at an Ulta location in the Commonwealth of Virginia during the applicable statute of limitations period.**

41. Plaintiff reserves the right to modify or amend the definition of the proposed Class, the applicable class period, and any proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

42. The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

---

[14] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/11/data-clean-rooms-separating-fact-fiction (last accessed November 12, 2026).

43. ***Numerosity.*** The Class contains members so numerous that separate joinder is impractical. The Class, upon information and belief, contains hundreds of thousands of members in the Commonwealth of Virginia. Members of the Class can be identified through Ulta's transaction records and other records maintained by Ulta concerning in-store purchases.

44. ***Predominance and Commonality.*** Questions of law and fact common to the Class predominate over individualized issues. Common questions of law and fact include, without limitation:

a. whether Ulta collects customer information during purchases made in its stores in Virginia;

b. whether Ulta sells this customer information to third parties;

c. whether Ulta provided adequate notice to customers during in-store purchases that it would sell their information to third parties;

d. whether Ulta may avoid the requirements of VPIPA by aggregating, pseudonymizing, segmenting, or otherwise transforming purchaser information before monetizing it;

e. whether Ulta violated VPIPA; and

f. damages needed to reasonably compensate Plaintiff and the Class.

45. ***Typicality.*** Plaintiff's claims are typical of the Class. Like members of the Class, Plaintiff made an in-store purchase at an Ulta location within the Commonwealth of Virginia.

46. ***Adequacy***. Plaintiff will fairly and adequately protect the interests of all members of the Class because it is in her best interest to prosecute the claims alleged herein to obtain full compensation due to her and the Class for the unlawful conduct of which they complain. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of members of the Class. Plaintiff has retained highly competent and experienced class action attorneys to represent

her interests and those of the Class. By prevailing on her own claims, Plaintiff will establish Ulta's liability as to the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in privacy litigation specifically. Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to members of the Class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

47. ***Superiority.*** A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands, if not millions, of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

## CLAIM FOR RELIEF

### COUNT I
### Violation of the Virginia Personal Information Privacy Act
### Va. Code § 59.1-442
### (By Plaintiff and the Class)

48. Plaintiff incorporates each and every factual allegation set forth above.

49. Plaintiff brings this cause of action on behalf of herself and members of the Class seeking statutory damages, totaling $100 per violation, as well as attorneys' fees and costs, available under Va. Code § 59.1-444 for violations of Va. Code § 59.1-442(A).

50. Ulta is a merchant under VPIPA because it is engaged in the sale of goods from a fixed retail location in Virginia. Va. Code § 59.1-442(B).

51. Plaintiff made an in-store purchase in the amount of $33.92 at a brick-and-mortar Ulta store, located in Chesapeake, Virginia, via her CashApp card on May 22, 2025.

52. Ulta gathered information concerning Plaintiff in connection with her in-store transaction, including information concerning her purchase and transaction history and the CashApp card transaction used to complete the purchase.

53. On information and belief, Ulta associated Plaintiff's in-store transaction with an identifier capable of linking that transaction to a customer or household profile and used information derived from the transaction in the data, audience, analytics, advertising, and related products described herein.

54. Ulta sold or otherwise monetized information derived from Plaintiff's and Class members' in-store transactions through the avenues described herein.

55. When Plaintiff made her purchase at Ulta, there was no sign at the store entrance, checkout area, payment terminal, or elsewhere informing her that Ulta would sell information concerning her that was gathered in connection with the purchase, and Ulta did not otherwise provide such notice before or at the time of the transaction.

56. Because Ulta provided no such notice, Plaintiff had no opportunity to exercise her statutory right under Va. Code § 59.1-442(A) to request that Ulta not sell information concerning her. Ulta's subsequent sale of that information therefore resulted not merely in a failure to provide notice, but in the actual unauthorized dissemination and commercial use of information concerning Plaintiff and her purchase.

57. The information sold by Ulta was not gathered for purposes of extending credit and was not information obtained from a public body as defined in the Virginia Freedom of Information Act, Va. Code § 2.2-3700 et seq. The challenged information was not sold in connection with a sale of Ulta's retail operations. Va. Code § 59.1-443.

58. Ulta's sale of Plaintiff's information or data was not made incidental to the sale or other disposition of accounts receivable.

59. Ulta's sale of Plaintiff's information or data was not made in conjunction with check validation transactions.

60. Ulta's sale of Plaintiff's information or data was made in order to increase Ulta's own revenue.

61. Ulta's unauthorized sale and commercial disclosure of information concerning Plaintiff and members of the Class invaded their substantive privacy interests and caused a concrete and particularized privacy injury. Plaintiff's injury is not merely the violation of a statutory procedure or Ulta's failure to provide a required notice. Ulta actually gathered information concerning Plaintiff in connection with her purchase, associated that information with an identifier capable of linking the transaction to a customer or household profile, and sold or otherwise made that information available to third parties for commercial purposes without first providing the notice required by the VPIPA.

62. The privacy injury caused by Ulta's conduct is closely related to harms historically recognized as actionable invasions of privacy, including intrusion upon seclusion. Unauthorized access to, obtaining of, use of, or disclosure of a person's personal information can itself inflict a concrete privacy injury. Such an injury does not depend upon the information subsequently being published to the general public, misused to commit identity theft, or causing some additional downstream consequence. The unauthorized invasion of the individual's private affairs and loss of control over personal information is itself a cognizable harm.

63. Ulta's conduct inflicted precisely that type of injury on Plaintiff and members of the Class. Information concerning what a person purchases, when and where the person shops,

how the person pays, and the purchasing patterns revealed by those transactions concerns that person's private affairs and interests. By linking such information to Plaintiff and members of the Class and commercially disclosing, using, or making that information available to third parties without the notice required by Virginia law, Ulta interfered with their right to control access to information concerning their private purchasing activities and invaded their concrete privacy interests.

64. Plaintiff and members of the Class also suffered economic injury to the value of their personal information itself. Information concerning an identifiable consumer's purchasing history, preferences, payment activity, and shopping behavior possesses commercial value precisely because it is capable of being collected, combined, analyzed, and used to identify and target that consumer. Ulta's unauthorized collection, linking, disclosure, and commercialization of that information deprived Plaintiff and members of the Class of exclusive control over a commercially valuable asset and diminished its value to them. Once Ulta disseminated or made that information available to third parties for commercial use, Plaintiff and Class members could no longer exercise the same degree of exclusivity and control over the information, and the information was correspondingly less valuable than it would have been had Ulta maintained its privacy as required by law.

65. The diminution in value was not hypothetical. Ulta itself commercially exploited the same information because purchaser information that can be tied to actual shopping behavior has economic value to advertisers, data partners, and other third parties. By appropriating and disseminating that value for its own benefit without providing the notice required by the VPIPA, Ulta reduced Plaintiff's and Class members' ability to control, withhold, or themselves exchange access to their personal information while Ulta retained the economic benefit generated from it.

66. In addition, Ulta obtained economic value from information generated through Plaintiff's and Class members' retail transactions and monetized that information through the commercial practices alleged herein. Plaintiff and members of the Class paid Ulta for retail transactions that, under Virginia law, carried with them the protection that information concerning them gathered in connection with those transactions would not be sold to third persons without the notice required by the VPIPA. Ulta nevertheless retained both the purchase price and the additional economic value it generated by secretly commercializing information concerning those purchases.

67. As a result, Plaintiff and members of the Class did not receive the full benefit and value of the transactions for which they paid. A retail transaction in which the merchant complies with applicable privacy protections and does not secretly commercialize purchaser information is more valuable to a privacy-conscious consumer than an otherwise identical transaction in which the merchant secretly sells information concerning the purchaser for its own commercial benefit. Plaintiff and members of the Class therefore were deprived of the benefits of their bargain, separate and apart from the concrete invasion of privacy caused by Ulta's unauthorized sale and disclosure of their information.

68. As a result of Ulta's violations of the VPIPA, Plaintiff and Class members are entitled to damages of $100 per violation and, if they prevail, may be awarded reasonable attorneys' fees and court costs under Va. Code § 59.1-444.

**PRAYER FOR RELIEF**

Plaintiff seeks the following relief for herself and the Class:

a. An order certifying the asserted claim or issues raised as a class action on behalf of the Class;

b. An order naming Plaintiff as the Class Representative and appointing Plaintiff's attorneys as Class Counsel;

c. An order declaring that Ulta's conduct violated VPIPA;

d. An order awarding Plaintiff and the Class statutory damages in the amount of $100 per violation pursuant to Va. Code § 59.1-444;

e. Prejudgment interest to the extent permitted by law;

f. Reasonable attorneys' fees and court costs under Va. Code § 59.1-444, if awarded by the Court; and

g. An order granting Plaintiff and the Class such further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 13, 2026

Respectfully submitted,

*/s/ William J. Edelman*
William J. Edelman
Michael A. Acciavatti
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
T: (866) 252-0878
wedelman@milberg.com
macciavatti@milberg.com

Zachary Arbitman*
George A. Donnelly*
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com

*Pro Hac Vice Application to be Filed

*Attorneys for Plaintiff and the Class*